IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| TAQUASHONE RAY, | ) | CASE NO. 4:24-CV-00264-JRK |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE JAMES R. KNEPP, II |
| vs. | ) | UNITED STATES DISTRICT JUDGE |
| | ) | |
| WARDEN HAROLD MAY, | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| Defendant. | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| | ) | |

This matter is before the magistrate judge pursuant to Local Rule 72.2.  Before the Court is the Petition of Taquashone Ray ("Ray" or "Petitioner"), for a Writ of Habeas Corpus filed pursuant to 28 U.S.C. § 2254. Ray is in the custody of the Ohio Department of Rehabilitation and Correction pursuant to journal entry of sentence in the case *State v. Ray*, Mahoning County Court of Common Pleas, Case No. 2019 CR 930 A.  For the following reasons, the undersigned recommends that the Petition be DENIED.

## I.      SUMMARY OF FACTS

In a habeas corpus proceeding instituted by a person in custody pursuant to the judgment of a state court, factual determinations made by state courts are presumed correct unless rebutted by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *see also Franklin v. Bradshaw*, 695 F.3d 439, 447 (6th Cir. 2012); *Montgomery v. Bobby*, 654 F.3d 668, 701 (6th Cir. 2011).  The state appellate court summarized the facts underlying Ray's conviction as follows:

> {¶2} This case is related to but not consolidated with another appellate case, *State v. Shainquon Sharpe* (22 MA 0021). Appellant and Sharpe were codefendants in this matter and were tried jointly. This case only concerns Appellant's conviction and sentence.

1

{¶3} The incident at issue stemmed from an act of retaliation related to a prior drug deal. In that prior criminal act, one of the victims in this matter, Edward Morris, allegedly shot a man named Brian Benson during the drug-deal-turned-robbery. According to the state, Benson decided to wait for tensions to cool before he retaliated against Morris by putting out a request for a "hit" on Morris. Appellant and Sharpe were apparently staying in the Columbus area and learned that Benson was looking for someone to kill Morris for him. (Trial Tr., p. 722.) It is noted that the state alleges Brian Benson is also known by an alias, Jeffrey Johnson. However, due to the state's failure to provide certain discovery, the record is somewhat muddled and confusing in this regard, as the trial court ruled (after certain witnesses had already used the name Benson) that the state could not use this name and was limited to calling this person by his alias.

{¶4} On October 31, 2018, Appellant's codefendant, Sharpe, exchanged the following messages with a person referred to as "Bossman Young." Young is not further described within the record.

> [Sharpe] Bet I won't be in Youngstown till 7. * * *

> [Young] Okay. When you coming back? * * *

> [Sharpe] When I get mobile and these guys up. * * * Guns up.

(Trial Tr., p. 953.) According to the state, this message reflects preparation to accept and carry out the hit on Morris, as it refers to obtaining guns and arranging travel to Youngstown.

{¶5} On November 1, 2018, Sharpe exchanged messages with a man named Demetrius Dawson. As the record reflects only Sharpe's side of the conversation, Dawson's messages are unknown. Similar to Young, there is no further information or description of Dawson within the record.

> [Sharpe] Shit you tell me. I'm trying to meet the nigga with that play on Edward. * * * And I need 9 bullets. We was looking for some more yesterday.

(Trial Tr., p. 960.)

{¶6} Again, the state's theory is that this message was to further the killing, as it reflects an attempt to contact the person ordering the hit and an attempt to obtain ammunition.

{¶7} On November 4, 2018, Appellant messaged Johnson/Benson:

> [Appellant] Shit you still want Ed or naw? * * *

2

[Johnson/Benson] I ain't think about that shit. I'm doing me, bra. But if it come down to it, then hey. * * *

[Appellant] I know you wasn't already know, bra, but I got him with [sic] his bro where I want him, you know? [sic] * * * [C]all my phone (330)881-0368 and we can talk about it when you're not busy, bra, but I can get it done ASAP.

(Trial Tr., pp. 963-964.)

{¶8} On November 6, 2018, Sharpe texted a person named Chiana Sharpe: "I need you to take me out east right now. I got a 10 band move." (Trial Tr., p. 954.) According to testimony from law enforcement, ten bands refers to $10,000, and the payment offered for the killing of Morris was $10,000. These texts from both Appellant and Sharpe were offered by the state as evidence that the two men both actively sought to accept and carry out the hit together.

{¶9} Ultimately, there were three victims in this case: Edward Morris, Valarcia Blair, and a three-month-old child named Tariq. Blair is the mother of Tariq and it appears that Morris is the child's father. On the day of the incident, Blair was at her mother's house in Youngstown before driving off with Morris in his silver Saturn. Blair was in the front passenger seat and Tariq was in a car seat in the back.

{¶10} Morris parked the Saturn along a devil strip on Pasadena Avenue in Youngstown. Testimony at trial was offered to suggest that the house nearest his parked car was a known drug house. A white Ford Focus pulled up and parked in front of the Saturn. It is unclear what happened immediately after the two vehicles parked, however, at 7:04 p.m. police heard gunshots and a Spotshotter (a mechanism used to quickly alert law enforcement to shots fired) reported gunshots on Pasadena.

{¶11} Youngstown Police Department Patrol Officer John Wess was the first to respond to the scene. He had heard the shots fired while he was having what he described as a late lunch in a nearby parking lot. He immediately proceeded to the scene and arrived within a minute or so due to his close proximity. He observed Morris in the driver seat of the parked Saturn with visible gunshots wounds and significant bleeding. Patrolman Wess noticed a gun on his lap, so he first retrieved the gun for officer safety before tending to Morris. Morris was blinking and taking shallow breaths, but as it was clear to Patrolman Wess that Morris would not survive, he turned his attention to Blair.

{¶12} As Patrolman Wess attended to Blair, who also had gunshot wounds, he noticed she kept gesturing with her head to the backseat. It was then that

3

Patrolman Wess saw the car seat. He immediately checked Tariq, who was bloody and had sustained multiple gunshot wounds. Because the ambulance was four minutes away, Patrolman Gregory Tackett and Patrolman Kelly transported Tariq to the hospital in a patrol car. When the ambulance arrived at the scene, it transported Blair to the hospital. The paramedics declared Morris dead on the scene. Both Blair and Tariq succumbed to their injuries at the hospital.

{¶13} Investigators located approximately thirty shell casings in and around the Saturn. A single .45mm caliber shell matched the pistol Morris had on his lap when police arrived. At least nineteen of the casings were 7.62 by .39mm caliber, consistent with ammunition used in an AK-47 rifle. The remaining shell casings were consistent with a .39mm caliber firearm and appeared to come from a Luger handgun.

{¶14} Ten minutes after the shooting, Appellant messaged Johnson/Benson:

> [Appellant] Check and mate. * * *
>
> [Johnson/Benson] [W]hat's popping? * * *
>
> [Appellant] Call me (330)881-0368. * * *
>
> [Johnson/Benson] In the car deep. * * *
>
> [Appellant] Job done.

(Trial Tr., pp. 964-965.)

{¶15} A witness told investigators that they did not see the shooting, but had observed a man standing near the hood of the Ford Focus who took off running northbound on Gibson immediately after the shooting. Law enforcement quickly turned their attention to the Ford Focus and learned that it belonged to a woman named Michelle Douglas.

{¶16} According to Douglas, she had just begun dating Sharpe, whom she referred to as "Mann Mann." On the day of the shooting, she had picked up Sharpe earlier in the day and they went to a Taco Bell. While there, Sharpe texted someone named "Little" and told Douglas that they needed to pick him up at Wick Park. At trial, Douglas identified Appellant as "Little." (Trial Tr., p. 641.) She drove the two men to her place of work and then let them use her car. They later picked her up at work and dropped her off at a plaza, where her friend picked her up and took her to a birthday party, so that they could keep her car. Around 8:34 p.m. that day, Sharpe informed Douglas that her car was parked on Pasadena and she would not be getting

4

it back any time soon. He did not explain why but urged her to stay away from the Pasadena area.

{¶17} When police interviewed Sharpe, he informed Detective Ronald Barber, Jr., that Appellant is his cousin and that they lived in Columbus. He denied that he had been on Pasadena Avenue on the night of the shooting, claiming that he had been at his cousin Kenneth's house on the northwest side of Youngstown.

{¶18} Appellant gave police investigators conflicting stories. He first said that his car had broken down and he left it near the intersection of Pasadena and Gibson. He then told investigators that he went to Pasadena Avenue to buy marijuana at the drug house. While he was still inside his car, he heard gun fire and ducked down inside of the car until the gun fire ceased. When the shooting stopped, he claims the car would not start so he exited and ran down Gibson to a gas station, where he called his brother to pick him up.

{¶19} The Ohio Bureau of Criminal Investigation crime lab discovered DNA on one of the .39mm shell casings. This DNA alerted police to a possible match through the Combined DNA Index System ("CODIS"). CODIS matched Sharpe to the DNA found at the scene. When they learned of this alert, police obtained a warrant for a DNA sample from Sharpe. Testing showed Sharpe was a likely contributor of the DNA on the casing. Appellant had agreed to submit a DNA sample before he learned of the DNA on the shell casing. However, as the only usable DNA had included Sharpe, investigators saw no need to obtain Appellant's sample.

{¶20} Cell phone records were admitted to show various text messages and calls by the pair. The records were also admitted to show that Appellant's cell phone "pinged" off a nearby cell phone tower and placed him near the scene. (Trial Tr., p. 932.) Roughly one half hour before the shooting, the towers appear to show that Appellant traveled from the north side of Youngstown to the scene. One minute after the shooting, the outer perimeter of a circle marking his location on a map included the sidewalk in front of the scene of the shooting. The towers showed him then travelling northwest of the scene until Sharpe used Appellant's phone in an area located on the west side to call to Douglas.

{¶21} An autopsy revealed that Morris suffered six gunshot wounds to the head, neck, and trunk. Blair had five gunshot wounds to the trunk and upper right extremity. Tariq had multiple gunshot wounds, most significantly to his torso and upper thigh.

{¶22} Appellant and Sharpe were charged in a single indictment with nine counts pertaining to both defendants, one pertaining solely to Appellant, and one solely attributed to Sharpe. The joint charges included: three counts of

aggravated murder, unspecified felonies in violation of RC. 2903.01 (A)(F), RC. 2929.02(A); one count of aggravated murder, an unspecified felony in violation of RC. 2903.01 (C)(F), RC. 2929.02(A); three counts of murder, unspecified felonies in violation of RC. 2903.02(A)(D), RC. 2929.02(8); one count of obstruction of justice, a felony of the third degree in violation of RC. 2921.32(A)(5), (C)(4); and one count of improperly discharging a firearm at or into a habitation, a felony of the second degree in violation of R.C. 2923.61(A)(1), (C). Except for the obstruction charge, each charge carried an attenuated firearm specification in violation of R.C. 2941.145(A). In addition, Appellant was charged with having weapons while under a disability, a felony of the third degree in violation of R.C. 2923.13(A)(3)(8) with an attenuated firearm specification.

{¶23} On January 11, 2021, Appellant filed several motions, including a motion to sever the trial. Although the court initially granted this motion, the state later filed a motion for reconsideration of this issue which the court granted.

{¶24} After a thirteen-day trial, the jury convicted both codefendants on all counts as charged in the indictment. On February 28, 2022, after considering merger issues, the trial court sentenced Appellant to the following: life without parole until after thirty years (Count I), life without parole until after thirty years (Count II), life without parole until after thirty years (Count III), five years of incarceration (Count XI) and three years for each of the four firearm specifications. The firearm specifications were ordered to run consecutively and prior to the remaining sentences, which were also ordered to run consecutively. It is from this entry that Appellant timely appeals.

*State v. Ray*, 7th Dist. Mahoning, No. 22MA0026, 2023-Ohio-2375, ¶¶2-24.

## II.     PROCEDURAL HISTORY

### A.     Trial Court Proceedings

On October 31, 2019, the Mahoning County Grand Jury indicated Ray, and his co-defendant, Shainquon Sharpe, on the following charges: four counts of aggravated murder (Counts 1, 2, 3 and 4), one count of obstructing justice (Count 9), one count of having a weapon while under a disability (Count 10), and one count of improperly discharging a firearm at or into a habitation or school safety zone (Count 11). (Doc. No. 10-1, Ex. 1.) All counts had a three-year firearm specification. (*Id.*) Ray entered a plea of not guilty to all charges. (Doc. No. 10-1, Ex. 2.)

On May 19, 2021, Ray filed a Motion for Severance, requesting a separate trial from his co-defendant. (Doc. No. 10-1, Ex. 3.) On May 25, 2021, the trial court granted the Motion for Severance. (Doc. No. 10-1, Ex. 4.) On September 22, 2021, the State filed a Motion to Reconsider Separate Trials. (Doc. No. 10-1, Ex. 5.) On September 24, 2021, Ray filed an opposition. (Doc. No. 10-1, Ex. 6.) Ray and his co-defendant were tried jointly. (Doc. No. 10-1, Ex. 15 at ¶2.)

The case proceeded to jury trial on January 25, 2022. (Doc. No. 10-1, Ex. 7.) On February 10, 2022, the jury returned its verdict, finding Ray guilty of four counts of aggravated murder, three counts of murder, one count of obstructing justice, one count of having a weapon while under a disability, and one count of improperly discharging a firearm at or into a habitation or a school safety zone. (*Id*.; see also Doc. No. 10-1, Ex. 8.) On February 18, 2022, the trial court filed an Amended Judgment Entry of conviction. (Doc. No. 10-1, Ex. 9.)

On February 18, 2022, the state trial court held a sentencing hearing. (Doc. No. 10-1, Ex. 10.) The trial court merged the offenses for sentencing purposes and sentenced Ray to serve twelve years on the mandatory firearm specification, followed by three consecutive life sentences with parole eligibility after 90 years, followed by a five-year sentence on Count 11. (Doc. No. 10-1, Ex. 10.)

## B.    Direct Appeal

Ray, through counsel, filed a timely notice of appeal to the Seventh District Court of Appeals, Mahoning County, Ohio. (Doc. No. 10-1, Ex. 11.) In his appellate brief, he raised the following assignments of error:

I.      Appellant's Convictions Were Against the Manifest Weight of the Evidence

II.     Appellant's Convictions Were Unsupported by Sufficient Evidence

III.    The Trial Court Erred by Granting the State's Motion to Reconsider Joinder
        After First Granting Appellant's Motion to Sever

IV.    Appellant's Sentence is Contrary to Law Because the Record Does Not Support
the Imposition of Consecutive Sentences

(Doc. No. 10-1, Ex. 13.)

The State filed a brief in response. (Doc. No. 10-1, Ex. 14.)  On June 30, 2023, the state appellate

court affirmed Ray's convictions. (Doc. No. 10-1, Ex. 15.) On September 18, 2023, Ray, proceeding *pro se*,

filed a Notice of Appeal with the Supreme Court of Ohio and a "Motion for Leave to File a Delayed Appeal

Pursuant to S.Ct.R. 7.01(A)(4).". (Doc. No. 10-1, Exs. 16, 17.) On November 7, 2023, the Ohio Supreme

Court denied Ray's motion for delayed appeal. (Doc. No. 10-1, Ex. 18.)

**C.    Federal Habeas Petition**

On February 12, 2024,[1] Ray, *pro se*, filed a Petition for Writ of Habeas Corpus in this Court and

asserted the following grounds for relief:

> **GROUND ONE**:  Petitioner's Convictions Were Against the Manifest Weight of
> the Evidence.
>
> **GROUND TWO**: Petitioner's Convictions Were Unsupported by Sufficient
> Evidence.
>
> **GROUND THREE**: The Trial Court Erred by Granting the State's Motion to
> Reconsider Joinder After First Granting Petitioner's Motion to Sever.

(Doc. No. 1.)

On September 10, 2024, Warden Harold May ("Respondent") filed his Return of Writ. (Doc. No.

10.) Ray did not file a Traverse.

---

[1]  Under the mailbox rule, the filing date for a *pro se* petition is the date that a petitioner delivers it to
prison authorities. *See Houston v. Lack*, 487 U.S. 266 (1988).  Ray did not disclose when he delivered the
Petition to prison authorities, thus the Court will consider the Petition as filed on February 12, 2024, the
date the Court received the Petition. There is no challenge regarding the timeliness of the Petition.

### III.    EXHAUSTION AND PROCEDURAL DEFAULT

**A.    Legal Standard**

Petitioners must exhaust their state remedies prior to raising claims in federal habeas corpus proceedings.  *See* 28 U.S.C. § 2254(b),( c).  This requirement is satisfied "when the highest court in the state in which the petitioner was convicted has been given a full and fair opportunity to rule on the petitioner's claims." *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir.1990).

Federal courts will not consider the merits of procedurally defaulted claims, unless the petitioner demonstrates cause for the default and prejudice resulting therefrom, or where failure to review the claim would result in a fundamental miscarriage of justice.  *See Lundgren v. Mitchell*, 440 F.3d 754, 763 (6th Cir. 2006) (citing *Wainwright v. Sykes*, 433 U.S. 72, 87, 97S.Ct. 2497, 53 L.Ed.2d 594 (1977)).  A claim may become procedurally defaulted in two ways. *Id.*  First, a petitioner may procedurally default a claim by failing to comply with state procedural rules in presenting his claim to the appropriate state court.  *Id.; see also Maupin v. Smith*, 785F.2d 135, 138 (6th Cir. 1986).  If, due to petitioner's failure to comply with the procedural rule, the state court declines to reach the merits of the issue, and the state procedural rule is an independent and adequate grounds for precluding relief, the claim is procedurally defaulted.[2] *Id.*

Second, a petitioner may also procedurally default a claim by failing to raise and pursue that claim through the state's "ordinary appellate review procedures." *O'Sullivan v. Boerckel*, 526 U.S. 838, 848, 119

---

[2] In *Maupin*, the Sixth Circuit established a four-step analysis to determine whether a claim is procedurally defaulted. 785 F.2d at 135. Under this test, the Court decides (1) whether the petitioner failed to comply with an applicable state procedural rule, (2) whether the state courts actually enforced the state procedural sanction, (3) whether the state procedural bar is an "independent and adequate" state ground on which the state can foreclose federal review, and (4) whether the petitioner has demonstrated "cause" and "prejudice." *Id.* at 138–39; *Barkley v. Konteh*, 240 F. Supp.2d 708 (N.D. Ohio 2002). "In determining whether a state court actually enforced a procedural rule, we apply the 'plain statement' rule of *Michigan v. Long*, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983)"; *Lovins v. Parker*, 712 F.3d 283, 296 (6th Cir. 2013) ("a procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on the procedural bar.") (citations omitted).

S.Ct. 1728, 144 L.Ed.2d 1 (1999).  If, at the time of the federal habeas petition, state law no longer allows the petitioner to raise the claim, it is procedurally defaulted. *Engle v. Isaac,* 456 U.S. 107, 125 n. 28, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982); *see also Coleman v. Thompson*, 501 U.S. 722, 731–32, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *Lovins*, 712 F.3d 283, 295 (6ᵗʰ Cir. 2013) ("a claim is procedurally defaulted where the petitioner failed to exhaust state court remedies, and the remedies are no longer available at the time the federal petition is filed because of a state procedural rule.")  This second type of procedural default is often confused with exhaustion.  Exhaustion and procedural default, however, are distinct concepts.  AEDPA's exhaustion requirement only "refers to remedies still available at the time of the federal petition." *Engle*, 456 U.S. at 125 n. 28.  Where state court remedies are no longer available to a petitioner because he failed to use them within the required time period, procedural default and not exhaustion bars federal court review. *Id*.  In Ohio, a petitioner is not entitled to raise claims in post-conviction proceedings where those claims could have been raised on direct appeal. *Id.*  Thus, if an Ohio petitioner failed to raise a claim on direct appeal, which could have been raised, the claim is procedurally defaulted. *Id.*

A claim is adequately raised on direct appeal if it was "fairly presented" to the state court. To fairly present a claim to a state court a petitioner must assert both the legal and factual basis for his claim. *See McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000).  Accordingly, a "petitioner must present his claim to the state courts as a federal constitutional issue – not merely as an issue arising under state law." *Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir. 1984).  A petitioner can take four actions in his brief which are significant to the determination as to whether a claim has been fairly presented as a federal constitutional claim: (1) reliance upon federal cases employing constitutional analysis; (2) reliance upon state cases employing federal constitutional analysis; (3) phrasing the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or (4) alleging facts well within the mainstream of constitutional law. *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006).

A petitioner's procedural default, however, may be excused upon a showing of "cause" for the procedural default and "actual prejudice" from the alleged error. *See Maupin*, 785 F.2d at 138–39. "Demonstrating cause requires showing that an 'objective factor external to the defense impeded counsel's efforts to comply' with the state procedural rule." *Franklin v. Anderson*, 434 F.3d 412, 417 (6th Cir. 2006) (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). Meanwhile, "[d]emonstrating prejudice requires showing that the trial was infected with constitutional error." *Id.* Where there is strong evidence of a petitioner's guilt and the evidence supporting petitioner's claim is weak, the actual prejudice requirement is not satisfied. *See United States v. Frady*, 456 U.S. 152, 172, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982); *Perkins v.LeCureux*, 58 F.3d 214, 219–20 (6th Cir. 1995); *Rust v. Zent*, 17 F.3d 155, 161-62 (6th Cir. 1994). Prejudice does not occur unless petitioner demonstrates "a reasonable probability" that the outcome of the trial would have been different. *See Mason v. Mitchell*, 320 F.3d 604, 629 (6th Cir. 2003) (citing *Strickler v. Greene*, 527 U.S. 263, 289, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999)).

Finally, a petitioner's procedural default may also be excused where a petitioner is actually innocent in order to prevent a "manifest injustice." *See Coleman v. Thompson*, 501 U.S.722, 749–50, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). Conclusory statements are not enough – a petitioner must "support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence-that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995). *See also Jones v. Bradshaw*, 489 F. Supp.2d 786, 807 (N.D. Ohio 2007); *Allen v. Harry*, 2012 WL 3711552 at * 7 (6th Cir. Aug. 29, 2012).

## B.    Application to Petitioner

Respondent argues Ray's Petition must be dismissed because he failed to accomplish one complete round of state appellate review due to his failure to timely appeal to the Ohio Supreme Court and the Ohio Supreme Court rejecting Ray's Motion for Leave to File a Delayed Appeal. (Doc. No. 10 at 14.) Ohio R.

11

Prac. S. Ct. 7.01(A)(1)(a)(i) provides an "appellant shall file a notice of appeal in the Supreme Court within forty-five days from the entry of the judgment being appealed." Here, the Court of Appeals issued its judgment on June 30, 2023. (Doc. No. 10-1, Ex. 15.) Ray filed his Notice of Appeal and Motion for Leave to File a Delayed Appeal on September 18, 2023 – well after the forty-five-day requirement. Because the state court was denied the opportunity to review Ray's claims due to his failure to raise the issues within the time provide by the rule, his claims are procedurally defaulted. *See O'Sullivan,* 526 U.S. at 848; *Engle*, 456 U.S. at 125 n.28.

Despite this failure, Ray can obtain merits review if he can show both cause and prejudice. *See Maupin*, 785 F.2d at 138–39. To show cause, an external factor must be shown to impede efforts to comply with the procedural rule. *See Franklin*, 434 F.3d at 417. Prejudice is not shown unless Ray demonstrates that there is a "reasonable probability" that the outcome would have been different. *See Mason,* 320 F.3d at 629. Here, Ray asserted in his Motion for Leave to File a Delayed Appeal that he did not file on time due to his "diabetic condition problems." (Doc. No. 10-1, Ex. 17.) Ray failed to offer any specific details and explanation on why or how his "diabetic condition problems" caused his failure to comply with Ohio R. Prac. S. Ct. 7.01(A)(1)(a)(i). The Court finds Ray has not demonstrated cause.

In the absence of cause, a court need not reach the issue of prejudice. *See Simpson v. Jones*, 238 F.3d 399, 409 (6th Cir. 2000); *Sandridge v. Buchanan*, 1:16CV2299, 2017 WL 2255378, at *11 (N.D. Ohio April 27, 2017); *Grp. v. Robinson*, 158 F. Supp. 3d 632, 651 (N.D. Ohio 2016).

Finally, Ray proffered no new, reliable evidence to support actual innocence. (Doc. No. 10-1, Ex. 17.) The Court finds Ray has not demonstrated he is entitled to the actual innocence exception.

The Court recommends finding that Ray's claims are procedurally defaulted.

## IV.    REVIEW ON THE MERITS

**A.    Legal Standard**

This case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254.  *See Lindh v. Murphy*, 521 U.S. 320, 326-27, 337 (1997).  The relevant provisions of AEDPA state:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> (1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (1996).

Clearly established federal law is to be determined by the holdings (as opposed to the dicta) of the United States Supreme Court.  *See Parker v. Matthews*, 567 U.S. 37, 132 S.Ct. 2148, 183 L.Ed.2d 32 (2012); *Renico v Lett*, 559 U.S. 766, 130 S.Ct. 1855, 1865-1866 (2010); *Williams v. Taylor*, 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); *Shimel v.Warren,* 838 F.3d 685, 695 (6th Cir. 2016); *Ruimveld v. Birkett*, 404 F.3d 1006, 1010 (6th Cir.2005).  Indeed, the Supreme Court has indicated that circuit precedent does not constitute "clearly established Federal law, as determined by the Supreme Court."  *Parker*, 567 U.S. at 48-49; *Howes v. Walker*, 567 U.S. 901, 132 S.Ct. 2741, 183 L.Ed.2d 612 (2012).  *See also Lopez v.Smith*, —— U.S. ——, 135 S.Ct. 1, 4, 190 L.Ed.2d 1 (2014) (per curiam) ("Circuit precedent cannot 'refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that this Court has not announced.'" (quoting *Marshall v. Rodgers*, 569 U.S. 58, 133 S.Ct. 1446, 1450, 185 L.Ed.2d 540 (2013))).

13

A state court's decision is contrary to clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. at 413.  By contrast, a state court's decision involves an unreasonable application of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id. See also Shimel*, 838 F.3d at 695.  However, a federal district court may not find a state court's decision unreasonable "simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly." *Williams v. Taylor,* 529 U.S. at 411.  Rather, a federal district court must determine whether the state court's decision constituted an objectively unreasonable application of federal law.  *Id.* at 410-12.  "This standard generally requires that federal courts defer to state-court decisions." *Strickland v. Pitcher*, 162 Fed. Appx. 511, 516 (6th Cir. 2006) (citing *Herbert v. Billy*, 160 F.3d 1131, 1135 (6th Cir. 1998)).

In *Harrington v. Richter*, 562 U.S. 86, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011), the Supreme Court held that as long as "fairminded jurists could disagree on the correctness of the state court's decision," relief is precluded under the AEDPA.  *Id.* at 786 (internal quotation marks omitted).  The Court admonished that a reviewing court may not "treat[ ] the reasonableness question as a test of its confidence in the result it would reach under *de novo* review," and that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id*. at 785.  The Court noted that Section 2254(d) "reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems" and does not function as a "substitute for ordinary error correction through appeal." *Id*. (internal quotation marks omitted).  Therefore, a petitioner "must show that the state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for

fairminded disagreement." *Id*. at 786–87.  This is a very high standard, which the Supreme Court readily acknowledged. *See id.* at 786 ("If this standard is difficult to meet, that is because it is meant to be.")

**B. Analysis**

    **1.**     **Grounds One and Two**

In Ground One, Ray argues his convictions were against the manifest weight of evidence. (Doc. No. 1, p. 1.) He claims he was "wrongfully found convicted and sentenced to a triple murder that he did not commit." (*Id*. at p. 2.) He states his co-defendant, Shai'quan Sharpe, shot the individuals while Ray was seated in a car that had broken down. (*Id*.) He states the trial court and appellate court erred by "unduly decid[ing] to restrict 'nlack [sic] jurors' from the jury box . . ." (*Id*.)

Respondent argues that a claim that a verdict was against the manifest weight of evidence is not cognizable before this court because it requires the appellate court to act as a "thirteenth juror" to determine whether the jury created a manifest miscarriage of justice such that the conviction must be overturned and a new trial ordered. (Doc. No. 10, at p. 16.)

In Ground Two, Ray claims his conviction was unsupported by sufficient evidence. (Doc. No. 1, p. 5.) He asserts the evidence offered was "thin and unpersuasive." (*Id*.) Ray argues the State did not present any direct evidence, including no eye witnesses, no witness identifying Ray, and no physical evidence such as fingerprints or DNA linking Ray to the murders. (*Id*.)

Respondent argues there was sufficient evidence to convict under the doubly differential standard or review, citing *Thomas v. Stephenson*, 898 F.3d 693, 698 (6th Cir.2018). (Doc. No. 10, pp. 17-22.) Respondent states that although circumstantial, the evidence presented is sufficient to support conviction because he was at the scene, communications show he was involved in the planning, and he offered inconsistent improbable statements. (*Id*. at p. 22.)

As Ray failed to file a Traverse, Respondent's arguments are unopposed.

Ray raised manifest weight of evidence and sufficiency of evidence arguments to the state appellate court. (Doc. No. 10-1, Ex. 13.) The state appellate court considered the claims on the merits and rejected both as follows:

> {¶25} In his first two assignments of error, Appellant relies on essentially the same arguments in contending that his convictions are against the manifest weight of the evidence and are not supported by sufficient evidence. In both, Appellant solely attacks the question of the identity of the perpetrator and does not contest any other element. He argues that the investigation was deficient, incomplete, and that there was no direct evidence linking him to the crime. Appellant argues that law enforcement made no attempt to obtain his DNA even though he made himself available for such purpose, did not retrieve fingerprints at the scene, did not test any of the phones, and failed to investigate whether a resident at a nearby house could have been responsible for the shooting. Appellant also cites to evidence that Sharpe used Appellant's phone to call Michelle Douglas the night of the shooting and alleges that in November of 2018, someone used Appellant's Face book account while Appellant was jailed. Thus, Appellant claims the messages relied on by the state may not have come from him.

> {¶26} In response, the state argues that Appellant admitted he was at the scene at the time of the shooting, and that he fled. The state also cites evidence showing an overarching plan that began when Johnson/Benson offered ten thousand dollars for someone to kill Morris. The states asserts that in text and Facebook messages from Appellant's account he asked Johnson/Benson if he still sought a hit on Morris. In addition, Appellant sent Johnson/Benson two messages fifteen minutes after the shooting saying "check and mate" and "job done." (Trial Tr., pp. 964-965.)

> {¶27} "Sufficiency of the evidence is a legal question dealing with adequacy." *State v. Pepin-Mccaffrey,* 186 Ohio App.3d 548, 2010-Ohio-617, 929 N.E.2d 476, ¶ 49 (7th Dist.), citing *State v. Thompkins,* 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). "Sufficiency is a term of art meaning that legal standard which is applied to determine whether a case may go to the jury or whether evidence is legally sufficient to support the jury verdict as a matter of law." *State v. Draper,* 7th Dist. Jefferson No. 07 JE 45, 2009-Ohio-1023, ¶ 14, citing *State v. Robinson,* 162 Ohio St. 486, 124 N.E.2d 148 (1955). When reviewing a conviction for sufficiency of the evidence, a reviewing court does not determine "whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *State v. Rucci,* 7th Dist. Mahoning No. 13 MA 34, 2015-Ohio-1882, 1114, citing *State v. Merritt,* 7th Dist. Mahoning No. 09-JE-26, 2011-Ohio-1468, ¶ 34.

{¶28} In reviewing a sufficiency of the evidence argument, the evidence and all rational inferences are evaluated in the light most favorable to the prosecution. *State v. Goff,* 82 Ohio St.3d 123, 138, 694 N.E.2d 916 (1998). A conviction cannot be reversed on the grounds of sufficiency unless the reviewing court determines no rational juror could have found the elements of the offense proven beyond a reasonable doubt. *Id.*

{¶29} Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other." (Emphasis deleted.) *State v. Thompkins,* 78 Ohio St.3d 380,387,678 N.E.2d 541 (1997). It is not a question of mathematics, but depends on the effect of the evidence in inducing belief. *Id.* Weight of the evidence involves the state's burden of persuasion. *Id.* at 390, 678 N.E.2d 541 (Cook, J. concurring). The appellate court reviews the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed. *State v. Lang,* 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, 11 220, citing *Thompkins,* at 387,678 N.E.3d 541,678 N.E.2d 541. This discretionary power of the appellate court to reverse a conviction is to be exercised only in the exceptional case in which the evidence weighs heavily against the conviction. *Id.*

{¶30} "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. Hunter,* 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, 1J 118, quoting *State v. DeHass,* 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. The trier of fact is in the best position to weigh the evidence and judge the witnesses' credibility by observing their gestures, voice inflections, and demeanor. *Seasons Coal* Co. *v. Cleveland,* 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984).

{¶31} Jurors are free to believe some, all, or none of each witness' testimony and they may separate the credible parts of the testimony from the incredible parts. *State v. Barnhart,* 7th Dist. Jefferson No. 09 JE 15, 2010-Ohio-3282, ¶ 42, citing *State v. Mastel,* 26 Ohio St2d 170, 176, 270 N.E.2d 650 (1971). When the record presents two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, we will not choose which one is more credible. *State v. Gore,* 131 Ohio App.3d 197,201, 722 N.E.2d 125 (7th Dist.1999).

{¶32} Appellant challenges only the jury's determination that he was involved in the shooting and does not contest any other element of the crimes. This record reveals this case was built largely on circumstantial

17

evidence, however, unlike his codefendant, investigators were able to place Appellant at the scene of the crime at the moment the shooting occurred.

{¶33} The state's theory of the case was that Appellant and his codefendant were involved in a scheme to carry out a murder for hire, or a "hit," on Morris. The hit was ordered by Johnson/Benson and investigators were able to present evidence at trial showing the steps taken by Appellant and his codefendant to carry out this killing.

{¶34} On November 4, 2018, Appellant messaged Johnson/Benson and appears to confirm the hit on Morris was still sought. (Trial Tr., pp. 963-964.)

{¶35} On November 6, 2018, Sharpe messaged a person named Chiana Sharpe: "I need you to take me out east right now. I got a 10 band move." (Trial Tr., p. 954.) According to testimony from law enforcement, "ten bands" refers to $10,000. This evidence was used to support the theory that Appellant and Sharpe planned to carry out the "hit" and receive the $10,000 offered by Johnson/Benson.

{¶36} Ten minutes after the shooting, Appellant messaged Johnson/Benson:

[Appellant] Check and mate. * * *

* * *

[Appellant] Job done.

(Trial Tr., pp. 964-965.)

{¶37} Investigators were also able to physically place Appellant at the crime scene at the time of the shooting. During Appellant's first interview with investigators, Appellant told them that he had no knowledge of the crime, that his car had broken down and he was forced to leave it on Pasadena Avenue before the shooting occurred. When Appellant was told that a witness saw a man running from the vehicle after the shooting, he then admitted he was present during the shooting. He claimed that when he heard gunshots he ducked down and hid inside his vehicle. When the shots stopped, he attempted to drive away. The car would not start, however, so he got out and ran away on foot.

{¶38} There are several problems with Appellant's second version of the facts. The vehicle he claimed to be hiding in had sustained multiple bullet holes, but he claims he miraculously escaped unharmed. He never provided any description of the persons he alleged were actually the shooters and never called the police about the crime. He never explained the coincidence

18

of being present at the scene of this shooting at the exact moment it was accomplished, after he had exchanged text messages regarding a hit on one of the victims. The record also reveals he had used Morris' first name in a text message to Johnson/Benson in discussing the proposed hit.

{¶39} Appellant argues that there is no evidence that the text messages are to be interpreted in the manner the state contended and that there is no evidence he actually sent those messages. Contrary to his contentions, read together the meaning of the messages appears clear. The messages do reflect a plan to kill Morris for money, and more than one message sent from phones owned by Appellant and Sharpe identified Morris by his first name. Further, Appellant's codefendant Sharpe phoned his mother from jail and asked her to call a number that belonged to Johnson/Benson. In the recorded call, Sharpe asked his mother to arrange for someone she trusted to pick up his money from the person she was to call, and who he would not identify by name. He told his mother that he was owed $5,000. Five thousand dollars is half of the amount Appellant and his codefendant were promised for carrying out the killing.

{¶40} Appellant implies the identity of the person who sent the message from his phone is in question. However, he admitted the phone belonged to him. The jury could presume he sent those text messages absent evidence clearly to the contrary. While Appellant alleges there was a period of time when he was incarcerated in 2018 that someone else used his Facebook account, there is evidence his passwords were later changed with no further problem. We note that most of the incriminating messages were in the form of text messages, not Facebook messages. Further, while Appellant claims that someone may have been using his phone the night of the shooting, he admits that he called his brother immediately after the shooting to pick him up at a gas station. Hence, the record contains unrefuted evidence that Appellant's phone was in his possession at least on the day of the crime. The text messages stating "check mate" and "job done" were sent ten minutes after the shooting. In addition, cell phone tower pings place Appellant's phone at the scene of the shooting and subsequent tracking follows a path similar to the one Appellant described he used to flee the scene.

{¶41} Appellant also complains that police did not investigate the owner of the house located near the shooting. Testimony was produced that the house was known as a drug house and that the owner was arrested the day after the shooting and was armed with a 9mm firearm. However, testimony was also introduced that the gun did not match any of the weapons used to kill the victims in this case and there was no evidence linking that man to this shooting or these victims.

{¶42} Appellant contends that there is no evidence that he knew Morris. However, a text message sent from his phone to Johnson/Benson stated:

"Shit you still want Ed or naw?" Morris' first name is Edward. This is no indication that this text message was sent by anyone other than Appellant. Whether or not Appellant was personally acquainted with Morris, Appellant clearly knew he intended to accept an offer to kill Morris for money if the offer was still available.

**{¶43}** While there is no question that the case was built on circumstantial evidence, "[c]ircumstantial evidence and direct evidence inherently possess the same probative value." *State v. Prieto,* 7th Dist. Mahoning No. 15 MA 0200, 411 34, citing *In re Washington,* 81 Ohio St.3d 337, 340, 691 N.E.2d 285 (1998); *State v. Jenks,* 61 Ohio St.3d 259, 272-273, 574 N.E.2d 492 (1991), paragraph one of the syllabus. In fact, "[e]vidence supporting the verdict may be found solely through circumstantial evidence." *State v. Smith,* 7th Dist. Belmont No. 06 BE 22, 2008-Ohio-1670, 41149.

**{¶44}** As such, Appellant's first and second assignments of error are without merit and are overruled.

*Ray*, 2023 WL 4485409, ¶¶ 25-44.

### a.  Manifest Weight of Evidence

"[A] claim that a conviction is against the manifest weight of the evidence is not cognizable upon federal habeas review." *Williams v. Jenkins*, No. 1:15CV00567, 2016 WL 2583803, at *7 (N.D. Ohio Feb. 22, 2016), report and recommendation adopted, No. 1:15 CV 00567, 2016 WL 1732928 (N.D. Ohio May 2, 2016), citing *Nash v. Eberlin*, 258 Fed.Appx. 761, 765, n. 4 (6th Cir. 2007); *Hess v. Eberlin*, 2006 U.S. Dist. LEXIS 99990, 2006 WL 2090093 (S.D. Ohio 2006) (citing *Walker v. Engle*, 703 F.2d 959, 969 (6th Cir. 1983)). Ray's First Ground is non-cognizable. It is therefore recommended that Ground One be DENIED.

### b.  Insufficiency of the Evidence

The Due Process Clause of the Fourteenth Amendment requires that a criminal conviction be supported by proof beyond a reasonable doubt with respect to every fact necessary to constitute the offense charged. *In re Winship*, 397 U.S. 358, 363–64, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).  The standard for determining if a conviction is supported by sufficient evidence is "whether after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements

20

of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 317, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). In making such a determination, a district court may not substitute its own determination of guilt or innocence for that of the factfinder, nor may it weigh the credibility of witnesses. *Id. See also Walker v. Engle*, 703 F.2d 959, 970 (6th Cir. 1983). Moreover, federal courts are required to give deference to factual determinations made in state court and "[a]ny conflicting inferences arising from the record . . . should be resolved in favor of the prosecution." *Heinish v. Tate*, 1993 WL 460782, at *3 (6th Cir. 1993) (citing *Walker*, 703 F.3d at 969–70.) *See also Wright v. West*, 505 U.S. 277, 296, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992) (the deference owed to the trier of fact limits the nature of constitutional sufficiency review.)

Consistent with these principles, the Supreme Court has emphasized that habeas courts must review sufficiency of the evidence claims with "double deference:"

> We have made clear that *Jackson* claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference. First, on direct appeal, 'it is the responsibility of the jury – not the court – to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury.' *Cavazos v. Smith*, 565 U.S. 1, ——, 132 S.Ct. 2, 4, 181 L.Ed.2d 311 (2011) (*per curiam*). And second, on habeas review, 'a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" *Ibid.* (quoting *Renico v. Lett*, 559 U.S. 766, ——, 130 S.Ct. 1855, 1862, 176 L.Ed.2d 678 (2010)).

*Coleman v. Johnson*, 566 U.S. 650, 132 S.Ct. 2060, 2062, 182 L.Ed.2d 978 (2012). Under this standard, "we cannot rely simply upon our own personal conceptions of what evidentiary showings would be sufficient to convince us of the petitioner's guilt," nor can "[w]e . . . inquire whether any rational trier of fact would conclude that petitioner . . . is guilty of the offenses with which he is charged." *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009). Rather, a habeas court must confine its review to determining whether the state court "was unreasonable in its conclusion that a rational trier of fact could find [petitioner] guilty

21

beyond a reasonable doubt based on the evidence introduced at trial." *Id.* (emphasis in original) (citing *Knowles v. Mirzayance*, 556 U.S. 111, 129 S.Ct. 1411, 1420, 173 L.Ed.2d 251 (2009)).

Upon careful review of the trial transcript, the Court finds the state appellate court reasonably determined Ray's convictions were supported by sufficient evidence. In resolving Ray's sufficiency of the evidence claim, the state appellate court accurately summarized the evidence and correctly identified the applicable law.[3] As the state appellate court noted, the evidence presented placed Ray at the scene of the crime at the moment the shooting occurred and demonstrated that Ray and his co-defendant were involved in a scheme to carry out a hit on Morris. Ray messaged Johnson/Benson to confirm he still sought a hit on Morris. (Trial Tr., pp. 963-64.) Messages from Ray's co-defendant supported the theory that Ray and Sharpe planned to carry out the hit and receive $10,000 from Johnson/Benson. (Trial Tr., p. 954.) Ten minutes after the shooting, Ray messaged Johnson/Benson "Check and mate" and "Job done". (Trial Tr., pp. 964-65.) Ray admitted he was physically at the scene when the shooting occurred. Ray first denied being present, and then later admitted he was at the scene during the shooting, but hiding inside his vehicle. (Doc. No. 10-1, Ex. 15 at ¶ 37.) Ray had no explanation for how the vehicle had sustained multiple bullet holes, yet Ray escaped unharmed. (*Id.* at ¶ 38.) Ray, despite being present at the scene of the shooting, never provided a description of the actual shooter and never called the police. (*Id.*) Ray never explained the coincidence of being at the scene after exchanging messages regarding a hit on one of the victims. (*Id.*) Ray implied that someone else could have sent the messages, but Ray admitted the phone is his and he called his brother to pick him up at a gas station immediately after the shooting. (*Id.* at ¶ 40.) There was no dispute the phone was in Ray's possession at least on the day of the shooting. (*Id.*) Cell tower pings place Ray at the scene. (*Id.*)

---

[3] A state court's interpretation of state law is binding upon a federal habeas court. *See Bradshaw*, 546 U.S. at 76; *Bibbs*, 2017 WL 4083558, at *15.

It is not for this Court to weigh evidence or determine credibility.  *See Jackson*, 443 U.S. at 317-19; *Coleman*, 566 U.S. at 651.  While Ray interprets evidence in a light most favorable to him, that is not the standard – the Court must view the evidence in a light most favorable to the prosecution. *Jackson*, 443 U.S. at 319.

Under the "doubly deferential" standard, the Court cannot say the state court "was unreasonable in its conclusion that a rational trier of fact could find [petitioner] guilty beyond a reasonable doubt based on the evidence introduced at trial."  *Brown v. Konteh*, 567 F.3d at 205.  Accordingly, the undersigned finds Ray's Second Ground fails on the merits. It is therefore recommended that Ground Two be DENIED.

## 2.    Ground Three

In Ground Three, Ray argues the trial court erred by granting the State's motion to reconsider joinder after first granting Ray's motion to sever.  (Doc. No. 1 at p. 13.) As discussed previously, Ray filed a motion asking the trial court to require a separate trial of Ray from his co-defendant. (Doc. No. 10-1, Ex. 3.) The trial court granted the motion. (Doc. No. 10-1, Ex. 4.) The State filed a motion to reconsider separate trials to which Ray filed an opposition. (Doc. No. 10-1, Ex. 5, 6.) Ultimately, Ray was tried along side his co-defendant.

Respondent argues Ray's Third Ground is non-cognizable because the severance of defendants falls within the state court's discretion, which does not typically implicate a Constitutional question that is reviewed in federal habeas corpus. (Doc. No. 10 at p. 25.)  Respondent states the burden falls on Ray to demonstrate that joinder is prejudicial. (*Id*.) Respondent attests both Ray and Sharpe denied they were involved in the shooting, and did not create a scenario where one confessed and implicated a non-confessing co-defendant. (*Id*.) Respondent argues Ray's burden to demonstrate prejudice is further diminished because the trial court instructed the jury that they had to separately assess the guilt or innocence of each defendant. (*Id*. at p. 26.)

23

As Ray failed to file a Traverse, Respondent's arguments are unopposed.

Ray raised his joinder argument to the state appellate court. (Doc. No. 10-1, Ex. 13.) The state appellate court considered the claim on the merits and rejected it as follows:

> {¶45} Appellant challenges the trial court's actions in initially granting his motion to sever the trials of he and his codefendant, but later granting the state's motion and reconsidering that decision. Appellant argues that joinder of the two trials was problematic, alleging that he and his codefendant essentially blamed each other and presented "different and mutually incompatible defenses." Appellant also complains that he could not cross-examine his codefendant Sharpe, who implicated Appellant in the murder, because he elected not to testify.

> {¶46} The state rebuts Appellant's claim that law enforcement first learned of Appellant's involvement in the crime after Sharpe implicated him. The state contends that other witnesses had mentioned Appellant's possible involvement prior to Sharpe. Regardless, Appellant conceded that he was at the scene of this crime at the time of the shooting and the argument that Sharpe implicated him cannot possibly have prejudiced Appellant.

> {¶47} Pursuant to Crim.R. 8(B):

> > Two or more defendants may be charged in the same indictment, information or complaint if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses, or in the same course of criminal conduct. Such defendants may be charged in one or more counts together or separately, and all of the defendants need not be charged in each count.

> {¶48} Under Crirn.R. 14, if it appears that a defendant is prejudiced by joinder of a codefendant, the trial court may grant a motion for severance. However, the burden is on the defendant to prove that joinder is prejudicial. *State v. Kozic,* 7th Dist. Mahoning No. 11 MA 160, 2014-Ohio-3788, ¶ 69. "The test is 'whether a joint trial is so manifestly prejudicial that the trial judge is required to exercise his or her discretion in only one way-by severing the trial. * * * A defendant must show clear, manifest and undue prejudice and violation of a substantive right resulting from failure to sever." *State v. Schiebel,* 55 Ohio St.3d 71, 89, 564 N.E.2d 54 (1990), citing *United States v.* Castro, 887 F.2d 988, 998 (9th Cir.1989).

> {¶49} An appellate court reviews a trial court's denial of a motion for severance for an abuse of discretion. *State v. Lott,* 51 Ohio St.3d 160, 163, 555 N.E.2d 293 (1990). Abuse of discretion involves more than an error or

24

judgment. It implies that the court's determination was unreasonable, arbitrary or unconscionable. *State v. Adams,* 62 Ohio St.2d 151,157,404 N.E.2d 144 (1980).

{¶50} Appellant, then, holds the burden of "affirmatively showing that his rights were prejudiced" and that the trial court abused its discretion in failing to sever the trials. *State v. Torres,* 66 Ohio St.2d 340, 421 N.E.2d 1288 (1981), syllabus. Appellant first asserts that his inability to cross-examine Sharpe, who chose not to testify, prejudiced his case. However, as this Court has already recognized, such an argument is speculative at best, as Sharpe would have been free to assert his Fifth Amendment right even if the trials were severed. See *State v. Bright,* 7th Dist. Mahoning No. 14 MA 0058, 2016-Ohio-6973, ¶ 18. There is no evidence that at a separate trial where Sharpe would have been witness he would have implicated himself and exculpated Appellant, as doing so would clearly have an adverse effect on his own criminal trial, where he faced life in prison.

{¶51} Appellant next argues that he and Sharpe had incompatible defenses and that they essentially pointed the finger at the other, thus forcing Appellant to deal with "an extra prosecutor." However, the record does not support Appellant's contention. For the most part, the defenses of both Appellant and Sharpe were very similar. Both argued that Appellant drove the Ford Focus to Pasadena Avenue without Sharpe and that Appellant happened to arrive at the scene at the wrong time. Both contended they were innocent of the alleged crimes and of planning the hit. The only "finger pointing" occurred when Sharpe's counsel argued that the familial relationship between Sharpe and Appellant (they were allegedly cousins) could have affected the DNA results implicating Sharpe. However, based on a prior incarceration Sharpe's DNA produced a CODIS alert that Sharpe was likely a match to DNA found on a piece of evidence at the scene. Evidence showed that Appellant had also been incarcerated and his DNA would likely also have been in the CODIS system. Yet, there was no alert to Appellant when the DNA on the evidence was tested. Thus, Sharpe's attempt to cast doubt on the DNA evidence linking him to the crime by raising the familial connection with Appellant does not appear likely to have impacted any aspect of Appellant's defense.

{¶52} Lastly, Appellant cites to the jailhouse call where Sharpe gave his mother Johnson/Benson's phone number and asked her to collect $5,000 that Johnson/Benson owed to him. Although this evidence may have been damaging to Appellant, significant evidence was presented involving texts between Appellant and Johnson/Benson regarding the planned hit. The evidence that Sharpe asked his mother to retrieve his half of the money for completing the killing was a relatively minor piece of corroborating evidence considering the amount of evidence offered against Appellant, directly. The phone call evidence cannot, in isolation, be seen as prejudicial.

25

{**¶53**} Accordingly, the trial court did not err in joining the trials of the two codefendants in this matter. Appellant's third assignment of error is without merit and is overruled.

*Ray*, 2023 WL 4485409, ¶¶ 45-53.

The Sixth Circuit explained the heavy burden that rests on a petitioner seeking habeas relief based on a trial court's failure to sever his trial from a codefendant's:

> A defendant is not entitled to severance merely because he might have had a better chance of acquittal in a separate trial. *See Zafiro v. United States,* 506 U.S. 534, 540, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993). Nor does he have a right to a separate trial merely because defendants present antagonistic defenses. *See United States v. Day,* 789 F.2d 1217, 1224 (6th Cir.1986) (holding that absent some indication that the alleged antagonistic defendants misled or confused the jury, the mere fact that co-defendants blame each other does not compel severance). Courts should grant a severance "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro,* 506 U.S. at 539, 113 S.Ct. 933. Granting or denying severance is within the trial judge's discretion. *See Glinsey v. Parker,* 491 F.2d 337, 343 (6th Cir.1974). And, a state trial court's alleged abuse of discretion, without more, is not a constitutional violation. *See Sinistaj v. Burt,* 66 F.3d 804, 805, 808 (6th Cir.1995).
>
> A petitioner seeking habeas relief on the basis of a trial court's failure to sever his trial from his co-defendant's bears a very heavy burden. *See United States v. Horton,* 847 F.2d 313, 316 (6th Cir.1988). As a general rule, joint trials are favored. *See United States v. Dempsey,* 733 F.2d 392, 398 (6th Cir.1984). Jurors are presumed to follow the instructions of the court and to give each defendant's case separate consideration. *See Francis v. Franklin,* 471 U.S. 307, 324 n. 9, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985). The mere potential for confusion, standing alone, will not outweigh society's interest in the speedy and efficient resolution of criminal trials. *See United States v. Moore,* 917 F.2d 215, 222 (6th Cir.1990).

*Stanford v. Parker*, 266 F.3d 442, 458–59 (6th Cir. 2001). "A defendant must make a strong and compelling showing of prejudice before reversal will be granted." *Horton*, 847 F.2d at 317. "To prevail [on a motion for a severance], the defendants must show that 'antagonism between co-defendants will mislead or confuse the jury.'" *United States v. Kendricks,* 623 F.2d 1165, 1168 (6th Cir.1980) (per curiam) (quoting *United*

*States v. Vinson,* 606 F.2d 149, 154 (6th Cir.1979). "The mere fact that each defendant 'points the finger' at another is insufficient; the defendant must show that the antagonism confused the jury." *Horton*, 847 F.2d at 317.

Here, Ray has not met his burden. Frist, granting or denying severance is within the discretion of the trial court (*Glinsey,* 491 F.2d at 343), and a trial court's alleged abuse of discretion is not a constitutional violation. *Sinistaj,* 66 F.3d at 805, 808. Moreover, Ray and his co-defendant did not present antagonistic defenses as they both denied being involved in the shooting. Even if they did "point the finger" at each other, that is not enough. *Horton*, 847 F.2d at 317. Finally, the trial court instructed the jury that they were required to decide the guilt or innocence of each defendant separately. (Doc. No. 10-6, Trial Tr. Vol. V at 1218.) Jurors are presumed to follow the instructions of the court and to give each defendant's case separate consideration. *See Francis,* 471 U.S. at n. 9. Ray has not presented evidence of juror confusion or that the jury did not follow the trial court's instructions. Ray's Third Ground fails on the merits. It is therefore recommended that Ground Three be DENIED.

## V.    CONCLUSION

For all the reasons set forth above, it is recommended that the Petition be DENIED.

Date: September 3, 2025                        *s/ Jonathan Greenberg*
                                              Jonathan D. Greenberg
                                              United States Magistrate Judge

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *Berkshire v. Beauvais*, 928 F.3d 520, 530-31 (6th Cir. 2019).**